May it please the Court, Sean Lyle on behalf of Plaintiff Appellant Gary Sicardi. This case, as you know, involves the question of a union employee's claim against his union for failing to properly represent him in the grievance, taking his grievance to arbitration. And it presents sort of a novel question, at least as my review of the case law is concerned in the Ninth Circuit and anywhere else for that matter. And that really is when the union's explanation for why it did not pursue a grievance to arbitration does not match the evidence presented by the plaintiff as to whether that investigation actually occurred or didn't occur, whether the union has shown as a matter of law that it fairly represented the employee. And essentially, to uphold the, to affirm the trial court here, the court would have to find that this discrepancy between what a key employee said, that's Jim Ballou, what he says he said to the union, and what the union says he said to the union is immaterial. Let me ask you just a clarifying question, because what Ballou says he would have said is different from what he says he said. And can you just explain to me where there is a dispute about what Ballou told Earle? Sure. Mr. Earle testified in his deposition and also in his affidavit in support of the summary judgment motion that Ballou, the employee, the co-worker, told Earle that plaintiff's skills had plateaued, that he wasn't catching on, that he was making a lot of mistakes, and that he had a long ways to go before he got to the same level as his peers. I'm sorry. This is which version now. This is what he told Earle. This is what he said. This is what Earle claims that Ballou told him. This is Earle's version of what he heard. OK, go ahead. Did Ballou say he didn't say that? Yes. In his affidavit, which begins at page 26 of the excerpts of the record, and in particular in paragraph, excuse me, that's Earle's affidavit. Ballou begins at page 47, and Ballou, at paragraph 7, states that one, the shop steward never questioned him about- I know that. I'm talking about Earle. Then he goes on to paragraph 11. I understand that Brian Earle states he asked me to generally compare Gary's overall skills as a color scanner operator. You see, those statements don't dispute what Earle says for what he told him. Well, he says, finishing that sentence, that he asked me to compare him with other employees in the department, and that I said that Gary wasn't on the same level. I'm sure he did not ask me this question. He goes on to say that this is the sort of thing he would have remembered. He also states in more detail that, on paragraph 16, that he never said he wouldn't vouch for Gary, which is something that Ballou said in his deposition, that because Earle wouldn't vouch for Sicardi, he had to drop the grievance. Earle states that, or Ballou states that, in paragraph 16, he didn't say that. He also says that- Here's the way I sort of see this thing. What the district court did was give the plaintiff a little more than I think maybe he had to do. But he just said, look, let's just forget any conversation with Ballou, whether it's controverted or not. Just put it aside. And if you put the Ballou conversations aside, you've still got plenty of evidence of a valid investigation. Because the union talked a number of times to Sicardi and his wife. It interviewed at least two other people. One of whom, his name is Getman, basically said the same thing. He said he's made a lot of mistakes. And they just concluded on that basis that it wasn't a winnable grievance. Had the process stopped at that point, then this would be a tough case for me. What the district court did that was wrong was to say, I'm going to ignore the fact that the union president, who decided what issues he needed to get answers to in order to handle this grievance, what he decided he needed to do was more than we would have required of him. And that is substituting court's judgment for the union's judgment as to what an investigation should consist of. Normally, it comes in from a different angle where the employee is telling the court or the union, you should have done this and this and this. And these additional steps would have led you to the conclusion that I have a good grievance. And the union says, hey, based on the evidence we had, we made our decision. And the courts aren't going to second guess it. Here, the union said, and this sort of involves Getman and the other employees, what really happened there was, there's some question about whether it happened or not, but I'll leave that for the moment. The shop steward claimed that he talked to four employees and that he reported back to the union president, Brian Earl, that the interviews with the employees weren't going well, that he was hearing from the guys that claimed they made a lot of mistakes. But that if you really want to know how he's doing, you should talk to Jim Ballou. He's the guy that everybody agrees is the most skilled and the best, the most knowledgeable as far as this goes. And he works right alongside with the plaintiff. And so Earl says, okay, I'll talk to Ballou. And in his deposition, he says he went to Ballou. I want to preface that by saying prior to that point in his deposition, he says, Earl says, I did look at the performance reviews that were presented by the employer. In my opinion, those couldn't be used in this context. Those couldn't be used to justify wiping seniority rights away. They could be used positively, but they are some support for showing a problem. He didn't say that in his deposition. He said essentially they were all but irrelevant. I didn't use that term, but he said in his opinion, the performance reviews are not evidence of prior discipline and they can't be used by the company, importantly here, to justify stripping Mr. Staccardi of his seniority rights. So at that point in time in his deposition, he's saying, I looked at the performance reviews. They really didn't influence me. I talked to my shop steward. He said, well, you should talk to Jim Ballou, but the word I'm getting back isn't positive. He then says, I went and talked to Ballou, and here's what Ballou told me. His skills have plateaued at a level below his peers. He's making a lot of mistakes. He's not catching on. And I think a fair reading of Ballou's affidavit is he didn't say those things. He says that nobody asked me to compare his skills to anybody else, so how could he have made that statement? He said that he didn't think that... You mean that he had plateaued and it was making a lot of mistakes? That his skills had plateaued at a level below his peers, because the contract provision here says that seniority rights could be disregarded if the employee is warned that their skills are inadequate and they've had an opportunity to improve, they haven't improved, then the employer can disregard seniority. And Ballou said that he said that he plateaued at a level less than his peers? Earl says that that's what Ballou told him. I mean, Earl says that's what Ballou said. Not that he had plateaued, but that he plateaued at a level less than his peers? He wasn't catching on, he was... Yeah, but where did Ballou... I just must have missed that. So, where did Ballou say that? I'm sorry, where did Earl say that Ballou said that? Thank you. 109 to 114 in the excerpts of record. And also, in his note, which is in excerpt 164 of the excerpts of record, he has a... what the union has said is a contemporaneous note of his conversation with Ballou. And that's at 164, his handwritten note says, didn't really show much improvement after initial plateau of skill development. And then, if you read that in context, with the 99 to 104. It's probably the most important at 104. I'm giving you the wrong number, I'm sorry, it's 114. Well, I'll look at it again. I just thought he said he thought he had plateaued. And at 112, you've indicated that Jim has plateaued. Jim told you that Gary was not up to par, not on the same level of his other scanner operator operators. Is that a yes? Yes. That's page 112 of the excerpts of record. And the important point, while I'm on that 164, I did want to point that out, there's that it alone, I think the existence of this document alone, allows the inference that the union did not adequately investigate the grievance and that much of what the union has presented as its factual investigation is simply not true. And a jury could decide that it didn't happen. This handwritten note, which is apparently dated the month of April and there's no year or date given, but it's excerpt of record 164, also says that Ballou told Earl that he wasn't working with Sicardi the evening that Sicardi made this mistake that precipitated his ultimate layoff slash termination. That wasn't really sure why problem in February happened, wasn't with Gary that night. And, of course, Ballou said, I never said that either, that's preposterous. I was working right alongside him when he made the error. I'm the one that caught it. I'm the one that reported it to management. I feel terrible that he got fired over it, that it's not fair that this happened to him and I feel badly. But, of course, I never would say that I couldn't comment to Earl about what happened that night that precipitated the ultimate layoff termination. And that discrepancy is so stark that you have to wonder, and a jury could easily find, that much of Earl's statements about what he did, how he investigated this grievance, were self-serving recollections. He probably confused his facts. He had many contracts to administer and really didn't recollect and he gave a statement in his deposition about why he dropped the grievance. But we don't know why he dropped the grievance. And that's what this comes down to. If Earl states that he dropped the grievance because he went to Ballou and Ballou wouldn't vouch for Sicardi, so he felt like he had a dead end, and Ballou was identified to him as the guy that he needed to speak with, this is the key employee with the most knowledge, then he had nowhere to go, he dropped the grievance. But Ballou says, that didn't happen. At best he came to me and said, how is Gary doing in Photoshop, and I said he's doing fine. And that he never asked me to comment on Mr. Sicardi's guilt. Let me ask you, what are you supposed to do with the fact that you have two affidavits from Ballou? I mean, he's the one who takes both sides. Well, he doesn't take that other side in his first affidavit. Yeah, but what do you do about that? I mean, you just say, okay, well that just goes into the jury next to him? To a degree, yes. I would point out that the union employer went to Ballou and got the affidavit in support of their motion for summary judgment. They prepared it, and it did not include any statement from Ballou that indicates Ballou told Earl what Earl plans he told him. So, the fact that Ballou, you know, the union is drafting this affidavit and Ballou, at least apparently, wouldn't agree. We don't know what the precise discussion was as far as what they wanted him to sign, but the fact that he'd omit any mention of ever having allegedly told Earl that Sicardi was second rate, making a lot of mistakes, not catching on, that omission or that failure to include any allegation like that in his first affidavit is consistent with his second, which is, I didn't say that. It wasn't true. I never would have said that. It's not my opinion of Gary. If I'd been asked to comment on his skills, I would have said he's as fine as anybody else. We all make mistakes. He made a mistake. And he is not deficient. He is not any more mistake prone than any of the rest of us in that he's a valued member of the team. That's what I would have said. That's not consistent with what Earl says he said. So, it's not a question, as the appellate has said in their brief, of the employee here saying the union didn't ask the question we wanted it to ask. We're just saying the union didn't follow its own investigation. The union, through the president, said to handle this grievance, we need to know, is he markedly deficient in comparison to his other employees? And the way I'm going to find that out is to go talk to Jim Ballou. And based on what Ballou told me, I concluded we had nowhere to go. Now, in the summary judgment affidavit, he adds to that the idea that the performance reviews somehow were also an impediment to processing the grievance to arbitration or to winning an arbitration. But that's at odds with what he said in his definition. And, again, a jury could find that what apparently happened here is the grievance was filed. The union president reviewed the documents, reviewed the performance reviews, met with the grievance, and said if this is all they have, this looks like a very winnable grievance, I'm confident. Plaintiff and his wife said that Earl told them it was going to be a slam dunk. Earl, in his deposition, didn't disagree that he may have said that. Nothing really changes between then and the time the grievance is dropped other than he talked to the employer and he supposedly heard from Ortega that the guys weren't really-the interviews weren't going well, but he should talk to Ballou. And, of course, he says that Ballou told him Sicardi's not catching on, he's making mistakes, and I won't vouch for him. And, again, we have Ballou saying that didn't happen. So that raises the question, why did they drop the grievance? And we don't know. The reasonable inference is that they didn't. The union just dropped the ball on the grievance. Later, sort of created an ad hoc explanation for why it dropped the grievance. And the facts that we've presented, that the plaintiff has presented, show that-or allow the inference that this truly was an ad hoc explanation and it's not factually correct. Thank you. Okay. Who's going first? If we please the court, my name is Todd Lyon. I'd like to talk to you today for about ten minutes, allowing counsel for the employer to also have an opportunity to talk with you as well. The legal standard, of course, we all know, arbitrary, discriminatory, or in bad faith. Let me talk a little bit about where we are in this case. We do not have a situation involving discrimination. The plaintiff has not pled discriminatory conduct, nor has he indicated any evidence that there was any discriminatory conduct on the part of the union. Similarly, this case is not about bad faith. The plaintiff did not plead bad faith and did not show any evidence of bad faith. This case, it seems to me, rises and falls on the arbitrariness, or alleged arbitrariness, of the union's conduct. And in particular, the union submits that because this case involves an exercise of the union's judgment, the law is clear. Arbitrariness in a DFR suit is not sufficient to find a breach. It would be clear if the record were what I would call a clean record. The problem here is, you know, the problem that Judge Rimer was addressing in speaking to Mr. Lyle, is that you have these two contradicting stories about what Ballou's position is, and then the district judge decides just to ignore it. He says, well, I'm going to pretend like Ballou never existed. I've never seen a similar judgment case like that where the judge says, Well, I'm going to just, you know, I'm going to pretend like there's no conflicting evidence here. What do you do with that? Well, this is what I do. I look at what the undisputed facts are, and I think that's what the judge at the district level was looking at. And so initially, we'll look at the undisputed facts, and then we'll get into this issue of the Ballou controversy. But from the get-go, we know that the union interviewed Mr. and Mrs. Ducardi a number of times, and talked to them about various subjects, including his skills, the performance evaluations, discipline, other potential witnesses who would support Mr. Ducardi in the grievance, and potential remedies. What do you want from this grievance? In addition, the union requested, reviewed documents from the employer. Those documents included the personnel file, the performance evaluations, the 2001 progress report, any discipline as well as training materials he reviewed. And in particular, with regard to the documents, the documents also are undisputed factual records in this case. So with regard to the September 2000 performance evaluation, it shows that Mr. Ducardi needed improvement in four significant areas. All that just comes down to maybe this is a somewhat marginal case, but it's pretty clear the guy they replaced him with is no better. So it's not a strong case on the provision the CBA relied upon, that he was so far below standard that they could ignore the seniority provision. And on that question, the evidence is controversial if you take into account what Ballou said. Well, Your Honor, that's the precise inquiry that plaintiff would have this court engage in. Plaintiff is desperate to get into the merits of the case. And in this particular instance, the court need only, and properly only, look at the union's conduct in its investigation. But if you look at the union's conduct in terms of drawing all the inferences from Ballou's testimony favorable to the plaintiff, you know, all those inferences are very adverse to the union. I mean, he said this guy was not below standard in the sense that you can invoke that provision of the collective bargaining agreement. He made mistakes, but there were no worse than anybody else. And, you know, a number of other things like that that oblige the position of the union. And would you say we should ignore that? Well, I think then if there is some conflict, and I'm not suggesting that there is, because I think that there are undisputed facts about what Ballou did present to the union. But if there are... That's the problem, you see, and the district judge decided to ignore that. What we have here is a very carefully crafted affidavit from Ballou. Of course, it's all carefully crafted. Aren't all your affidavits carefully crafted? But the problem here in terms of examining what is disputed and undisputed for Ballou was that he does not specifically deny in the affidavit in support of the plaintiff that Sicardi has a long way to go to get to where the others are at and that his skills and abilities have plateaued. Those two facts have not been specifically disputed on the part of the plaintiff. But more importantly, even if there is some discrepancy with regard to the facts here, then if it's the union's judgment not to go forward with the case, that judgment cannot be disturbed in an arbitrary case such as this. I agree with that rule, but the problem here is, you see, we don't know the facts upon which that judgment was predicated because of this record. In other words, if Ballou said the things that he says he said in his deposition, if that's what he really told Earl, then that's one basis for Earl making a judgment. But if Ballou told him what Earl said he told him, that's a different basis for making a judgment. We don't know the basis upon which that judgment was made. Do it. I'm sorry? On summary judgment. Well, again, Your Honor, I guess I'd have to go back to what is undisputed in this case. And in looking at the totality of the record that is undisputed, the performance evaluations did not help Mr. Sicardi in claiming that there was no marked inequities in his abilities. Similarly, the progress report indicated that he had failed to reach his goals identified in those progress reports. The union also reviewed and requested the documents from Sicardi and interviewed witnesses beyond Ballou. The union interviewed Mr. Bob Nelson and Mr. Dave Getman. Neither of those two witnesses indicated that Mr. Sicardi was working to the level of other journeymen operators here. Counsel, wasn't he observed by somebody in the company on a number of occasions? And of the ten tasks he had to do, he did six of them either well or they didn't criticize him. Those were four they were concerned about. And yet they said he was qualified. Why didn't they act then if they saw that he was not doing those four actions and continue to keep him qualified so he could continue to do the work? The company set up a training program for Mr. Sicardi to attempt to reach proficiency in those four areas after that September 2000 performance review. And I believe in October 2001, of the four areas he was deficient in, only one he managed to improve upon. And so in the October 2001 performance evaluation, he still needs improvement in quantity, quality, and job knowledge. And so they gave him an opportunity. Progressive discipline and that notion in labor arbitration is well embedded. And here, the company said, look, we're putting you on notice. You're not meeting our expectations. Here's a plan of action for you to get back on your feet and get up to the level of every other journeyman operator here. And why did they say he was qualified? On those two tests that they did with him, they claimed to be qualified to continue to do the work. He was an employee for 27 years. That's correct. And apparently he must have been doing a good job or else they wouldn't have continued him. Well, and in fact, based upon that progress, from September 2000 until finally the last straw broke the camel's back when the company said, that's it. We're done. Didn't they have the man who was the head of that unit that was supposed to work with him? That was Mr. Ballou. Yes. And he was responsible for the training. Yeah. Well, very quickly, I want to preserve some time for counsel for the employer. But the union also reviewed the collective bargaining agreement, paying particular attention to the section that issued, in this case, Section 5.8, attended all the grievance meetings, and fought for, during the grievance meetings, Mr. Sicardi's job back. And it was a revelation to the union during the Step 2 meeting when the president said, well, he doesn't even want his job back. When here, the union is trying to advocate for getting him his job back. I think with that, I'll stop and I'll let counsel for the employer. Thank you. Okay. May it please the court, Rick Van Cleve on behalf of the employer. I want to just address two issues, if I may. I think that the district court correctly ignored the conflict with respect to Mr. Ballou. Because I think in the first place, as you noted, Judge Reimer, the issue of Set aside those two and look at the investigations that were conducted and found adequate as a matter of law by this court in the Slavera, Fristo, and other cases. They didn't talk to anybody. The difficulty, of course, is that you're looking at the total mix, I guess, of information that's available. And is our question simply one of whether there is some evidence to support the judgment call that was made, therefore it can't be arbitrary? Or is the question whether if the total mix were accurately considered, it would have been arbitrary? If I understand the court's question correctly, the merits of the grievance are completely irrelevant. You don't even look at that. For example, this notion that Mr. Ballou's opinion one way or the other is somehow relevant to the merits of the grievance, it's just simply incorrect. If you look at the contract provision, the contract provision says if there's inequities, marked inequities, in the employee's abilities and skills, so long as he's been given verbal notice and written notice, those are the first two items which are clearly met here, and there's been insufficient improvement, he can lose his seniority. Now, the question, of course, is who gets to make those determinations? And plaintiff concedes, and that testimony can be found at page 84 of the supplemental extract, that it's the employer that makes the determination. The employer gets to decide whether there's been adequate improvement. It's the employer that decides whether the employee has adequate skills, and it's the employer that decides whether to put the employee on verbal and written notice. And there's simply no dispute that that occurred here. And that's the relevance of these performance reviews. And I will tell the court that I believe that the flip-flop that plaintiff has tried to create with respect to those two documents is simply a red herring. And here's the reason. What Mr. Earle says is that I don't believe those documents could be used for discipline. That's a completely separate and distinct question of whether the documents satisfy the threshold requirements of the seniority provision, that he had verbal and written notice. So the mere fact that they couldn't have been used for discipline, in Mr. Earle's opinion, whether that opinion is right or wrong, I mean, ultimately that's a decision for an arbitrator to make, not Mr. Earle. The simple fact is they do meet the contract requirements for verbal and written notice. But that's not what we're concerned with here, is it? We're concerned here with whether or not the union should have pursued the grievance. That's the only question before us, right? We don't care about any of those questions that you talked about. Well, I believe you do, Your Honor, because I think you have to frame the union's actions and you have to look at granting that there's a conflict in Mr. Blue's testimony. One of the things that's not disputed is that Mr. Earle reached the conclusion that Mr. Blue wouldn't be a particularly good witness. Well, it seems to me that that stands out pretty well in the record, because you have a witness who gave two entirely inconsistent affidavits under oath. Well, are there two affidavits under oath? Yes, he gave the union one in which he says he talked to Mr. Earle, but he doesn't remember what he told Mr. Earle. And then you have the more detailed one that he gave to plaintiff's attorney. Those two are inconsistent. That's the whole basis of plaintiff's argument that there's this inconsistency that the district court could not, ought not to have addressed. Let me ask you the same question I asked the counsel for the union. Do you know of a case where, on summary judgment, the district court can ignore that kind of, just put aside that kind of factual controversy, well, I'm just going to pretend like this guy doesn't even exist. I'm going to ignore his testimony. Isn't that essentially what the judge did here? I believe that's what Judge Mossman did, and frankly, he did it at my urging. Well, do you know of any case that supports that approach on summary judgment? I believe I do. Not specific to that point, Your Honor, but I do think that the Frisco, the Flavier case, and the Eichelberger case essentially stand for that proposition because, again, the question before the court is whether the union conducted a minimally adequate investigation. It's not whether they conducted the best investigation. I don't know, but none of those cases say, well, you can ignore a factual conflict in the record like that. I believe they do, Your Honor, because they don't say it explicitly. Here's where they say it. What they do is they say, in these cases, the union did X in terms of what their investigation was. In one case, the union didn't even talk to the grievant. He merely read her letter and dropped it in slobbera. They talked to the plaintiff or the grievant for quote-unquote about two hours and went to the Step 2 meeting. Well, let me try my question again. Okay. In this context, maybe it will be clearer. I can say it better. Our question is whether the union's investigation was arbitrary, whether the union made an arbitrary decision. Right? I would frame it somewhat differently, but I think that's correct. Well, okay. And do you decide that by asking yourself, is there any evidence to support the conclusion that in the investigation that it did conduct, is there evidence that supports the conclusion, therefore, it can't be arbitrary? Or do you look at the entire mix of information that was available to them and ask whether it was a proper decision and, therefore, not arbitrary? Have I said it any clearer? I think so. You never look at the question of whether it was a proper or improper decision. That's irrelevant. It's an exercise in judgment. And this Court has made clear that it's never second-guessed a union. So, if you don't look at whether it was proper, I submit to you, going back again to the four cases we've relied upon in the brief, the question is, do you decide to take out what's disputed and look at the rest? And the question is, does the rest of the investigation- Even if you don't take out what's disputed, what if you just put everything in there?  No. Why not? Because if you put everything together, there is at least a minimally sufficient investigation. And the fact that Mr. Blue had different opinions simply doesn't matter. Okay. Thank you. In the time that I have remaining, I think I just wanted to cite to you the precise portions of Mr. Blue's affidavit that really starkly differ from Mr. Earle's testimony. And they're really paragraphs 9, 10, and 11, which are on page 50 of his record. Bill, let me ask you the same question that I just asked Mr. Clayton. If you consider a whole ball of wax, then why is it that the union's judgment call has to be overturned? Well, it's irrational to explain its decision not to pursue agreements based on statements that the supposed statement makers say were not made. And we have to pursue a summary judgment. Why? Why can't the union say, look, the guy's obviously a friend of Gary's. He's a nice guy. He's not going to say anything bad about him. And I've got evidence from other people, plus the company's records, plus the fact that he conceitedly made a mistake that was costly to the company. And I just think it's not winnable. Why can't the union do that? They could have done that. That's a hypothetical that didn't happen here. What specifically happened is the union president said, Mr. Blue was identified to me as the key guy I need to speak with. I went to him, and he was critical of Sicardi. No, he said he wasn't supportive. He said, I didn't figure he would be supportive. No, no. That's in his affidavit. What he says at page 111, the question, did you ask him directly how Gary stacked up compared to the other scanner operators? Yeah, he told me he did not feel, he told me he hadn't progressed. You know, he hadn't plateaued. Well, there's just no dispute that that's true. I mean, whether Blue said it or not, it's a true statement. What he said is that Blue told him that Sicardi had a way to go to get to the level of everybody else, and that he was not there yet. And so Blue is saying, according to Pearl, Blue has told him that Gary had a way to go before he got up to the level of his peers. Now, Pearl says, or Blue says, that didn't happen. Let me just focus in one more time, OK? I assume that's all correct. And that we've got this entire picture in there, including conflicting statements. I believe it was himself, and between Blue and Earl. And that's all part of our mix. No excises. Question. Why does the judgment call, based on all of that information made by the union, have to go because it's arbitrary? Because the union's explanation for dropping the grievance is that Mr. Porter, he didn't have anywhere to go. Now, Blue says, that's not the case. And he asked me to vouch for Sicardi. I would have. And there's other evidence to suggest. And so we're looking at the subjective decision-making by the union. And does the union subjectively have a good faith reason for dropping the grievance? And if that reason is gone, the record when the inferences are made in favor of the plaintiff is left with- You'd like me to respond? That's all right. Thank you. Do you have anything else? No. All right. Thank you, counsel, all of you, for your- Thank you. For the alert. The matter just argued will be submitted. And we'll next hear argument in Jacobs, Georgia Pacific. We're just prepared for this. We have a lot to go. Thank you. I can't resist saying that's one way to make a real splash. Okay. Now we'll hear argument in Jacobs, Georgia Pacific. Thank you, Your Honor. Good morning. Stephen Bruschetto for the plaintiff, Keith Jacobs. All right. What are you going to do to follow that up? Well, in all honesty, I hope that I don't deny anything. Your Honor, the issue in this case on the breach of fair representation claim is whether you apply the Ninth Circuit's decision in Tenorio, or whether this is a case which concerns a judgment of the union, and therefore Tenorio isn't applicable. Well, why doesn't this case turn on the interpretation of the last chance agreement? Wholly apart from any of the Tenorio factors, so that one could say, sure, maybe they're implicated, maybe they're not, whether they are or whether they aren't. This case turns on what the last chance agreement means. It doesn't turn on the terms of the last chance agreement, because what the union did here is it denied plaintiff the right to go through the internal formal decision-making process. Well, based upon its interpretation of the effect of the last chance agreement. Regardless of any interpretation of the last chance agreement, plaintiff still should be entitled to go through the internal decision-making process, because obviously in this kind of circumstance, there is substantial room for presenting to the union membership that this last chance agreement did nothing to my appeal rights. No, but I think what Judge Armour is getting at is, well, in view of the fact that, you know, their view, their meaning, the union leadership's view of the agreement, and their advice from their counsel, isn't that a position held in good faith? Maybe they should have done what you say. Maybe that was a better judgment, but how can you say what they did was arbitrary or in bad faith? The way I can say it's arbitrary... That's the question, isn't it? Whether it's arbitrary or in bad faith? Whether it's arbitrary or in bad faith, that's the question. The reason I can say that that is arbitrary in bad faith, because even if you assume that that's the issue, there still is... that's not an explanation or justification for depriving Jacobs of the formal decision of the union. If that decision is the decision of the union, it should have been made by authorized people. I'm sorry, that lost me. All right. The union has a process for deciding grievances, and the process is... Are we talking about deciding grievances, or are we talking about deciding whether to grieve? I don't think we're talking about either of those. I think we're talking about deciding to take a piece of paper from a union member to start the internal process. I mean, Jacobs was shut out of the process. Okay, so now you're flipping to the rogue meeting. Is that what you're on now? He knew he wanted to pursue his grievance. They did? After he said he wanted to pursue his grievance, they went and consulted their counsel to get a comfort feeling about the interpretation of the last chance agreement. And then there was a board meeting where nobody said, go forward with agreements. I don't think that those are undisputed facts. I think the undisputed facts are the day after he was terminated, he went to the president and said, I want to file a grievance, and the president said, you've got no right to appeal. There is nothing in the next emergency board meeting indicating anything of consideration of Jacobs' appeal. The board doesn't have to decide to appeal or not to appeal, does it? Under the bylaws, there are two processes for decision-making. One, the standing committee, which, according to the bylaws, reviews all grievances and presents them to management. Or, the e-board has general supervisory powers of the union between meetings subject to approval of the membership. If there was some issue that Jacobs could not file a grievance through the union, it needed to be approved by the membership. So, the fact that a group of individuals, if they met on January 9th as opposed to February, made some kind of determination really isn't a decision of the union through an authorized process. And the harm to Jacobs is obvious. If you look at what happened, nobody from the company wanted to hear Jacobs' side of the story. Nobody from the union wanted to hear Jacobs' side of the story. So, Jacobs' side of the story, he offers to get a polygraph and is told by his union rep on the morning he is terminated, we are not interested. He goes to file a grievance and the president says, I don't want to hear it. We just want to say this whole thing turned on the last chance agreement. I mean, that is the whole reason why all of those things you just mentioned aren't material. Because the last chance agreement means just that. He has had his chance. He is out of here. He has, by virtue of the last chance agreement, no more rights under the collective bargaining agreement. No more grievance process. No more just cause required for termination. I mean, that is the bottom line. A judgment call, maybe if it had gone the other way, maybe not. But that is the judgment call made by the union. I don't see that that is where the case turns. Because even if there is a judgment call to be made, it should be made through the normal union process, giving Jacobs the opportunity. Well, for example, no one interviewed Jacobs about whether or not this provision in the last chance agreement waived any appeal rights. Nobody gave him the opportunity to bring in information for the formal union decision makers to consider whether or not this provision in the last chance agreement actually, you know, what the actual language was. And as we noted once we got into discovery, Leroy Thorpe, the president of the union, conceded in deposition that it doesn't waive appeal rights. The triggering event has to occur. And we also presented information that the union had filed appeals under the exact same language in the last chance agreement before Jacobs was ever terminated. When the union found out that he had signed the last chance, they realized there was nothing they could do. Well, if that were the case, then how would the union explain the fact that about four months before Jacobs was terminated, the union represented another employee on a last chance agreement. He had two last chance agreements, and the union filed an appeal. They went through their normal process. They gave the individual. They presented it to management. They did their investigation. They let their standing committee make its decision. That is what Jacobs was denied. And there was a lot of room for arguing that the union, its attorney, everybody knew that this last chance agreement didn't waive a right to grieve. I mean, the language is plain on its face. So, I would see the way that the thing turns on, regardless of what the issue is, there really isn't any harm to the union or any reason for the union to not allow Jacobs to go through the decision-making process. He should have been able to appear in front of the e-board. He should have been able to present his position to the e-board and appeal to the membership, just like any other member of the union. If you don't accept that proposition, basically he has lost all his membership rights. I mean, basically what they are telling him is, you are no longer a member of the union. You don't have any rights to go to the membership. And I believe that- I haven't pursued this intensively because it just seems to me like it is off point. But my understanding of your due process point is that it has to do with internal union membership disciplinary issues, which is a totally different deal from this, which is a relationship with the employer. Why is that not right? Because, effectively, the union and employer's position is that the union doesn't have to go through its normal decision-making process, which under the bylaws- But that is for internal union member conflict. That is not the deal here. The deal here has to do with whether to pursue a grievance against the company. There are two documents- No evidence whatsoever. Well, I take that back. There is a conflict in the evidence as to whether that decision belongs- Whether the president is authorized to make that decision. We presented evidence that, in fact, the bylaws do not authorize the president to make that decision. There is nothing in the bylaws which say that the president can decide whether or not to process an appeal. That is why we argue that they did not go through the standard decision-making process. Those decisions should be made by the standing committee or by the board subject to approval of the membership. The due process argument is, if the union does not take the grievance issue in front of the proper entities within the union, and give Jacobs the ability to go to an e-board meeting, hear his case discussed, argue his case to the membership, he has effectively denied his membership rights. Why has he denied his membership rights? Well, there is nothing in the last chance agreement denying him his normal membership rights. So, our position is that effectively what the union has done is they have decided with the employer on this claim, and they have decided to shut Jacobs out. And he is entitled to notice and an opportunity for hearing if that is the case. And I might add that the evidence is all susceptible to the argument that the union could have, with very little difficulty, permitted the processing of Jacobs' grievance, at least to the point to permit him to go in front of the standing committee or to appeal to the membership. So, our argument is that if you look at the Tenorio decision, Tenorio focuses on four factors. And those are, is there an issue regarding the proper procedures that the union is using? In our view, the evidence presents issues as to whether the union went through the proper procedure. Two, is there a conflict of interest? We believe, is there a potential conflict of interest? We believe there is a potential conflict of interest in the roles of Mr. Fortenberry, who was an executive board member, and in the roles of Mr. McDonough, who we believe was acting as much on behalf of the employer in union decisions as a union member. And three, did the union intend to handle the grievance in a perfunctory or summary manner? The union admits that it intended to handle the grievance in a summary manner. The final Tenorio issue is, does it concern the most significant issue, and that is termination. So, in our view, it is squarely on point. This would be a different case if this decision had been, if somebody had talked to Jacobs, got his side of the story, somebody had gone to the standing committee, and the union had made a decision that there was no merit to the grievance. But that is the factual scenario here. I want to reserve about five minutes, so I'm going to take just about two minutes to talk about the disability discrimination claim. In our view, under the Lansford case, plaintiff has presented substantial evidence, both to establish a prima facie case that Mr. Jacobs was terminated because of a perceived disability, and substantial evidence that misconduct was not the motivating factor in the termination. This is a claim under state law, right? This is a claim under Oregon state law. Under Oregon law, he has to notify the employer in some way about the condition, right? Notify the employer of the condition? Of the disability or the, you know. I believe the employer has to have knowledge or notice of the underlying condition. And how is, and that, you know, some accommodation is necessary, medically necessary. I don't even think that this is an accommodation issue. What is it? I think it is an issue of different treatment on the basis of a perceived disability. And the perceived disability would be? An underlying mental disorder. Which would be? The mental disorder is, has, was characterized in depositions as mentally unstable. And there were reports to the employer to the effect that Jacobs suffered from emotional conditions which included poor impulse control, difficulties in self-perceptions, difficulties in communicating with others, difficulties in. And that's a disability. I believe that coming from a psychiatrist. If you think your employer is having trouble getting along with his co-employees, that under Oregon law is a perceived disability. Coming from a medical professional? Yeah. Recommending the need for. Somebody is legitimately, honestly having trouble getting along with people. I mean, he's a jerk or whatever. That's a perceived disability under Oregon law? I'm not saying that somebody who has a difficult time in getting along with others has a perceived disability under Oregon law. But what I am saying is that when the employer solicits a fitness for duty examination, gets a recommendation or a decision from a professional that the individual has emotional conditions that are described in the fashion that are in the report, and conditions the employee's continuation of employment upon treatment, I think that that is an underlying physical or mental impairment. I guess an employer who tries to help is doing himself a disservice. Is that the idea? The only issue of an employer trying to help doing a disservice is whether the employer operated on accurate information or- I'm just having trouble with the concept. That's the only reason I'm asking these questions. I don't understand exactly what you're saying a perceived disability is. I'm having a lot of trouble with that. The perceived disability is the employer's assumption that the employee is mentally unstable and as a result of mental instability is unable to get along with employees and is potentially violent in the workplace. So if the employer has that perception, what is the employer's obligation under Oregon law? The employer's obligation is to not discriminate on the basis of it. In the context of this situation, the discrimination is different treatment. And our argument was very simply that the employer could have and should have sat down and talked with Jacobs, informed him of what the charges are, got his side of the story, given him an opportunity to present any evidence. Can they do that with the last chance agreement? They had done that in the past with the last chance agreement. What do you mean? But they did not do it in relationship to the incidents that led to that. What are you saying? They have to just keep doing it over and over and over again every time an incident comes up? That's all they can ever do? Well, with respect to a new incident, yes, since they've never heard what he had to say about that. There's nothing unfair or inappropriate about that. And as a matter of fact, our position is that precisely what the employer did in this kind of circumstance is because they knew of this psychological evaluation requirement for treatment, they assumed that he was guilty of what was claimed, without giving him an opportunity to explain his side of the story. I'm down to two minutes and 50 seconds, so I'm going to save that for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. My name is Thomas Doyle. I'm from the firm of Bennett Hartman here in Portland, representing AWPPW Local 13. I think I said it correctly when I said this case comes down to the last chance agreement. This employee was on two last chance agreements. The last chance agreement specifically stated the employee waived their right to any defenses. The employee had an incident whereby it was clear to the local leadership that the employee had violated company policy, and it was clear to the local leadership that based upon their reading of the last chance agreement, that in fact the employee had no right to appeal that termination. There was a meeting that was held provisionally, whereby the executives of the local said, this is our understanding. This is probably where this is going to end up. We're not filing an appeal. In fact, it's undisputed that the day after the employee was terminated, he was told, you have no right to appeal. Who has the authority under the bylaws to make that decision? The vice president is known as the grievance chair, and where you have an individual that is seeking to file a grievance, it's the grievance chair who has the authority to file any grievances. Not the grievance committee? Not the grievance committee. The grievance chair can make the decision whether to file a grievance or not. Someone comes out of the blue and says, I want to file a grievance about the president of the United States. They say, no, that doesn't come under our grievance language. Sorry. Did the union try to do anything on his behalf? Absolutely. Well, the union had tried for years to do things on his behalf. In fact, they had negotiated the last chance agreement first. Then when there was a violation of that first last chance agreement, or arguably, they convinced the employer that, look, the last chance agreement really didn't cover this area. So then the employer said, okay, we'll give you another last chance agreement, and we're broadening it to include every violation, because that was an attendance issue. They said, you have to follow all the policies. He goes ahead. We have three different incidents where he's alleged to have violated that second last chance agreement. What do they do? They do an investigation. They speak with the individuals who have the complaint about the Heister incident, attempted running over to co-employees. They talk to another employee who was feeling harassed, Rick Souter, who was feeling harassed by the employee. They talk to a third employee. They do that as part of the investigation, to figure out what's out there, what's going on. Then they assign someone to represent the employee, Mr. Jacobs, in the meeting with management, and the fact is undisputed that that grievance representative, that union representative, Mr. Spores, meets with Mr. Jacobs for an hour and a half before the investigation meeting, and before the meeting says, this is the situation. They've told me that this is what they've got. They're going to fire you. You have a choice. Either you're going to go out peacefully or they're going to fire you. You either resign or they're going to fire you. That's an hour and a half long discussion. It took a long time to go over those issues. Repeatedly, Mr. Jacobs said, didn't happen, didn't happen, didn't happen. That's what the union did to help him. In fact, the union went above and beyond and confirmed their understanding of the effect of the last chance agreement on the employee's right. They talked to their counsel, and the counsel said, yeah, that's what that means. That's the way it's probably going to be interpreted. You're waiving your defenses. You're waiving your right to appeal. So, as a result, the union made the decision not to proceed with that grievance, not to file that grievance because there was no right to appeal. That's an act of judgment. In fact, they didn't have to do any investigation under the reading of Evangelista. Under Evangelista, where it turns on a contract interpretation issue where it's clear on the face of the contract, and they render what would be considered a legal decision, that look, we don't have a right to appeal that. The union doesn't have to conduct any further investigation than that. But they went above and beyond the call of duty. They did investigation, and they spoke with their counsel to confirm that, what would be referred to as a legal opinion. There's no evidence of bad faith. There's no evidence of discriminatory treatment by this union. And, in fact, there certainly is no evidence of disability discrimination by this local. I haven't heard any evidence presented on that. I noticed my time has just started at 1953, so I think I've taken a little more than seven seconds. Unless the court has any additional questions, I'll reserve the remainder of what I actually have and let the employer's representatives speak on this issue. Thank you. May it please the court, Brad Tellem on behalf of Georgia Pacific. So I'm down to what? You've got about ten minutes. Ten minutes? Perfect. I won't take that long. Let me, initially I want to echo some of the things that Mr. Doyle just said. He correctly noted that the Evangelista case suggests a number of things, including the fact that the scope of the union's investigation is limited, is going to be determined by the circumstances in the context. And the context here, which is what I don't think we can forget, is that there were last chance agreements. And those last chance agreements, whether or not there were the determination that could ultimately be made one could disagree with on whether or not agreements should go forward, those last chance agreements, in effect, limit or suggest what the scope of the investigation should be. And, Judge Reimer, I think you were exactly correct at the beginning of the argument when you suggested that this case begins and ends with the last chance agreement. The union did an investigation, obtained legal advice relating to it, and that is the duty of fair representation claim. That's obviously not my job. The DFR claim is against the union. So what I wanted to do was to just spend a couple of minutes talking about the last chance agreement itself, clarify a few points perhaps, and then just talk briefly about the disability discrimination claim. The last chance agreement, there's a couple of things that I just want to clarify in the reply brief. There's a discussion of a fields arbitration and some suggestion that because the last chance agreement either wasn't authorized by the collective bargaining agreement or that because nobody from the union signed on that, therefore, the last chance agreement is more than valid in some abrogation or derogation of the collective bargaining agreement's rights. In fact, the fields arbitration language, which is in the excerpt of the record, although there's a few missing pages, but at least from what I've been able to figure out from it, that decision related to, again, coincidentally enough, two last chance agreements that were signed. The first one was without a union representative present. The second one did have a union representative present. And while the arbitrator in the fields arbitration said that because there was no union representative present while the union member negotiated the last chance agreement, in fact, in this particular case, there was union representation in both of the last chance agreement signings, and so I don't think there's any merit to that argument at all. There's also some discussion about whether or not there was duress in the execution of either of the two last chance agreements and some suggestion that there may have been something more than what one would normally think about in a last chance agreement, but I would direct the court to supplemental excerpt of record at page 19 in which the duress was, if you don't sign the last chance agreements, you will be fired. I think that's the duress that's inherent in every last chance agreement, and so there's really nothing- yeah, that's duress, there was duress, but I think that's appropriate duress under the circumstances. There's also some suggestion that the last chance agreement is, I think, ambiguous would be the best way to describe it, and that there's nothing that says that Mr. Jacobs' conduct relative to the Heister incident or to the Rick Souter Bible or the incident with Mr. Herbert, but somehow that he couldn't have known what he wasn't supposed to do. But, you know, Mr. Jacobs was very clear in his deposition that there were some things that he was supposed to do and he understood them. He talked about that he had to act like a robot, that he needed to watch his back and not talk out of turn to anybody and do his job. All of those things, those three incidents alone or collectively suggest, in fact, that there was a violation of the last chance agreement, that he knew what the last chance agreement imposed upon him and that the company was absolutely justified in terminating him. With respect to the disability claim, let me make a couple of points. First of all, and I don't believe I heard counsel dispute this, I think we are clearly under the federal McDonnell-Douglas analysis in determining the allocation of the burdens of proof at the summary judgment stage, even though it's a state claim. The Snead case from several years ago suggests that that's the case in diversity cases, and I don't know of a principled reason why that wouldn't be the case here, and I think that that is accurate. There are differences, and the Oregon Court of Appeals has recently suggested again that there is a distinction between federal law and Oregon state law disability scheme relative to what the definition of disability is, and that there may be some broader scope of disability that is picked up. That, however, doesn't mean that we have some difference here. In the first place, as Judge Tashima, you are absolutely correct, this is a regarded-as claim, so the accommodation analysis does not even apply, and we are looking at a regarded-as condition. The cases where the Oregon courts have found the distinction of disability is the Sutton kind of analysis. Do we look at disability in the context of mitigating circumstances or not? The Oregon courts to date have said that we don't look at the mitigating acts that have taken place, we look simply at the disability of the individual. This is a regarded-as claim, and we don't have mitigation, we don't have anything like that. What we have, and Judge Reimer, I think you hit it exactly on the head, we have someone who is unable to interact with others wanting that to be a regarded-as disability claim, and there are plenty of cases that suggest that that is absolutely insufficient, and there is no Oregon authority on point. Even though, if we got that far, the simple fact is that there is no evidence of pretext here. Obviously, we have to have some, because the articulated response from the employer is, this is a case where the last chance agreements were violated, that is why we did the termination. It has nothing to do with anything that we thought about Mr. Jacobs regarding his... No, but the violation was the result of this disability, and that's the plaintiff's side, right? That is the plaintiff's side, but I don't believe that there's any proof, any facts in the record to suggest that that's causation. That is an inference that clearly the plaintiff wants to take, but there's no evidence in the record that any, that other than the fact that they thought he had a difficult time getting along with others or was violent. I suppose that he would respond that the, was it Patterson or Peterson, at the exit interview basically saying that he should, you know, go see a doctor again because it seemed to help for a while. Might show. Certainly, but again, I think that goes back to your point that if an employer shows empathy for an employee, is that some basis, and apparently, and frankly by that time, the decision had been made to terminate. It may be. Why isn't it? Well, I wouldn't, I just wouldn't, I don't believe it is. I don't see how the suggestion that someone, if someone had broken a leg and, you know, you said continue on, go to the doctor, you're not regarding someone as necessarily disabled. And the fact is that the incidents were things that would be, to be regarded as having a disability, the employer has to be mistaken about what the disability and what the material limitations are. In this case, if the employer was concerned about Mr. Jacobs' inability to get along with others, that's okay because that's not, there are cases that suggest that that is not, in fact, a regarded as disability claim. The kind of empathy that an employer suggests to an employee in this circumstance simply doesn't rise to the level to establish causation or pretext. How long did he work for the company? I believe 10 or 11 years. Pardon me? 10 or 11 years. Mr. Brichetto probably knows that one. How long was he? That I don't know. Thank you. Mr. Brichetto? He worked for the company 11 years, Your Honor. Pardon me? He worked for the company 11 years. Age? Mid-30s. And he knows how to read and write? He knows how to read and write. Just very briefly, I do want to take a moment just to respond to issues about who was authorized to do something in this kind of circumstance. The Local 13's bylaws are set forth in the Record Act ER 76, and the bylaws describe the duties of the officers, including the president and the vice president. The bylaws contain no authority-they contain no statement indicating that either of those people in either of those offices has authority to decide whether to process grievances. Rather, on page 80, the bylaws talk about-in ER 80, the bylaws talk about the executive board's authority. And on 81-excuse me, 82, they talk about the standing committee's authority. And the standing committee has authority to-the standing committee shall review and present grievances to management. The bylaws require the standing committee to review any grievance of any member. Now, let's assume that the court concludes that somebody else made the decision besides the standing committee. The problem with that argument is that there are disputed issues of fact. The union claims that the president or the vice president made the decision. However, the president signed interrogatories saying that it was the executive board who made the decision. The union takes the position that this occurred at an informal meeting of union officials where the decision was made. However, the interrogatories say it was the executive board. And there is no recorded decision of the executive board. So, the union can't establish as undisputed fact the facts upon which they rely to say a judgment was made. When he appeared before-someone from the union did go with him. It was a shop steward, Mr. Spors. Went with him on that occasion. Yes, sir. He was there when he signed it. When he signed the last chance agreement? Yes, sir. The two last chances agreement, one he was accompanied by Mr. Tharp and one he was accompanied by Mr. Spors. I note that my time is up. I appreciate your consideration, judges. Thank you much. Thank you, counsel. All of you, the matter just argued will be submitted and the court will stand in recess for the day. All rise. Mr. Spors, if you would like to return to your chair.
judges: Rymer, Tashima, Weiner